The People of the UNITED STATES of America ex rel. John ROMANO, Petitioner,

v.

Edward M. FAY, Warden of Green Haven Prison, Stormville, N. Y., Respondent.

United States District Court
S. D. New York.
April 17, 1963.

Sabbatino & Todarelli, New York City, for petitioner, Thomas J. Todarelli, and William H. Frappollo, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., of New York, for respondent, Barry Paul Mahoney, Deputy Asst. Atty. Gen., of New York, of counsel.

TYLER, District Judge.

Relator, John Romano, here seeking a writ of habeas corpus, is presently serving a sentence of life imprisonment imposed by the County Court of Kings County, New York (Leibowitz, J.) following conviction, on July 10, 1946, in that Court of the crime of murder in the first degree. The state's case, in brief, was that Romano and three others, in the early morning of November 21, 1945, committed an armed robbery in a bar and grill in Brooklyn and that, while fleeing from the scene, shot to death one Albert Davidoff.[1] Romano was tried with two of the other alleged bandits, Vincent Giarraffa and Russell Donohoe; the fourth, David Donohoe, had died prior to trial from bullet wounds received while fleeing from the scene.

Relator's application asserts that he was deprived of due process at the trial in two respects: (a) the prosecutor suppressed exonerating evidence and made knowing use of perjured testimony. (Mooney v. Holohan, 294 U.S. 103, 55 S. Ct. 340, 79 L.Ed. 791 (1935)); (b) a law enforcement agent, Officer Edward Fritz, perjured himself at trial (Curran v. State of Delaware, 259 F.2d 707 (3d Cir., 1958), cert. den., 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959).).

It is necessary, first, briefly to review the testimony and other evidence offered at trial.[2] The testimony of five individuals who were present at the scene of the robbery, as well as the written statements and oral testimony of defendants Giarraffa and Donohoe, tended to establish the following:

Arthur Polansky, owner of Duddy's Bar and Grill, at approximately 2:30 a. m. on the morning of November 21, 1945, had locked the door of his establishment and started totalling the cash register. Also present in the bar at that time were George Miller, the "day bartender", Leo Frinstein, the "night bartender", Edward Fritz, an off-duty police officer, Margaret Dale, a cook employed at the bar and grill, and Al Davis, the deceased. Sometime thereafter, Giarraffa and David Donohoe knocked at the door, were admitted, and ordered a drink. They were followed by Romano and Russell Donohoe. One of these four then announced, "this is a stick up". Giarraffa jumped over the bar and took money from the cash register. Romano, David Donohoe and Russell Donohoe held guns. Al Davis started toward David Donohoe. The latter pulled the trigger of his weapon twice, but it merely "clicked" and did not fire. Polansky then sought to restrain Davis and, in so doing, caused both men to fall to the floor.

At this point, and while the four bandits were exiting through the front door, Officer Fritz, at the rear of the bar, fired six shots at the bandits with his .38 caliber service revolver, hitting Giarraffa and David Donohoe. Two shots were fired back at him.

The four fled through the door in the direction of their near-by automobile. Davis got up off the floor and raced through the door after them. Then, four or five shots were fired by one of the bandits, the testimony indicating that the shots were fired by Romano. Polan-

---

1. Better known to the professional boxing world as Al "Bummy" Davis. He will be referred to hereinafter, as he usually was in the state proceedings, as Al Davis or Davis.

2. See 46 Records, Appellate Division, Supreme Court, Second Department, May, 1947.

sky, looking out through a window, saw Davis lying outside and a car going off down the street.

Polansky ran out to Davis and found him lying in the street, wounded and bleeding. Davis died shortly thereafter.

Davis had been hit three times. Two of the bullets were found in his person; both were .32 caliber. Four shells of the type used with a .32 caliber bullet were found in the parking lot outside the bar. A .32 caliber bullet was found imbedded in a portion of the telephone booth located at the rear of the bar and grill. All of these .32 caliber bullets and shells were fired from one and the same weapon. That weapon was never found.

Officer Fritz testified that he owned a .32 caliber weapon but did not have it at the scene. This weapon was subsequently produced, however, and found not to be the one that had fired the shells or bullets found at the scene.

All three defendants were found guilty of murder in the first degree. Romano's conviction was affirmed on appeal to the Appellate Division, Second Department, People v. Romano, 272 App.Div. 834, 71 N.Y.S.2d 755 (2d Dept., 1947). Certiorari was denied by the United States Supreme Court, 332 U.S. 839, 68 S.Ct. 213, 92 L.Ed. 411 (1947).

On December 3, 1952, Romano filed a petition for a writ of error *coram nobis* in the Kings County Court to have his conviction set aside as having been obtained in violation of rights secured to him by the "due process" clause of the fourteenth amendment of the Constitution of the United States. A hearing on the petition was held before Judge Leibowitz on May 25, 26 and 27, 1953.

The factual allegations presented in the petition and affidavits appended to it were in brief, as follows:[3]

(1) The prosecuting attorney at the trial, Assistant District Attorney Julius Helfand, "schooled" witness Frinstein to identify Romano as being one of the bandits. (2) Frinstein, contrary to his testimony at trial, was unsure that Romano was in fact one of the bandits. (3) Witness Miller was "told" by the assistant district attorney to identify Romano as one of the bandits. (4) Miller's testimony at trial that he could not be sure whether Romano was one of the bandits was in fact incorrect since he, Miller, was, and is, "positive" that Romano was not one of the bandits. (5) The assistant district attorney knew, but through appropriate instructions to the witnesses, suppressed the fact that, there was a sixth person present in the bar at the time of the robbery, one Frank Dale, husband of Margaret Dale. (6) The version of the shooting told by Frank Dale establishes that the deceased, Al Davis, was in fact shot by Officer Fritz who was in an inebriated condition and firing wildly from two pistols in succession, the second being an "unauthorized" .32 caliber weapon.

On the first day of the hearing, May 25, 1953, the son and wife of Frank Dale testified that he had been present at the scene of the robbery. Frinstein also testified that Frank Dale had been present. Further, first Miller and then Frinstein gave testimony stating in substance the allegations, summarized above, that their testimony at trial, when asked whether Romano was one of the bandits, was inaccurate and that they were schooled or told to make an identification.

Both Miller and Frinstein were cross-examined on this testimony and on their affidavits, containing similar statements of fact, signed by each of them in 1950 and tendered with the *coram nobis* petition. On cross-examination, which was conducted by State's counsel, and by Judge Leibowitz in large part as well, Miller was read portions of his affidavit, including statements that: "I could identify the fourth man if I ever do see him again"; and, "There is a great injustice being done to Romano, as he, John

Romano, was not a member of the hold-up gang present at Duddy's Bar." Despite these statements, Miller was unwilling on the witness stand, with respect to identifying Romano as one of the bandits, to say more than that he "did not know" whether Romano was one of them. The information was also elicited from Miller that the affidavit had been brought to him in 1950 for his signature by Tony Romano, relator's brother.

Miller was then and there remanded by Judge Leibowitz in lieu of $25,000 bail to be held for Grand Jury investigation of possible perjury by him.

On direct examination, Frinstein refused to subscribe to the statement in his own affidavit that Assistant District Attorney Helfand had "schooled" him. On cross-examination, Frinstein reiterated that, notwithstanding his positive identification of Romano at trial, he, Frinstein, was in fact unsure that Romano had been one of the bandits.

Frinstein was, also, then remanded in lieu of $25,000 bail to await Grand Jury consideration of a charge of perjury.

The next witness was Margaret Dale, wife of Frank Dale. She testified that her husband was in the bar at the time of the shooting.

Mrs. Dale also testified that Officer Fritz, immediately after the shooting, had asked all present not to mention that he had been at the scene, and, further, that the officer was "drunk". In this connection, Frinstein, on direct examination on May 25 had testified that Officer Fritz had requested everyone to keep his presence at the shooting a secret.

Mrs. Dale testified that just prior to the entry of the bandits, she had been "preparing an order for a Thanksgiving dinner". Near the close of her testimony she was confronted with a statement in an affidavit signed by her that the kitchen was "closed" at that time.

Judge Leibowitz then invited a motion by the state to remand Mrs. Dale pending consideration of a charge of perjury. The Court reserved decision on this ensuing motion, and adjourned the proceedings for the day.

At the outset of the second day (May 26) of the *coram nobis* proceedings, counsel for Romano, Mr. Sabbatino, applied for discontinuance of the proceedings on the ground that his client was not being accorded a fair hearing. The motion was denied. Mr. Sabbatino then announced that he had "no further witnesses to call".

At this point the state, through Mr. Helfand, recalled Frinstein to the stand. Frinstein proceeded to testify that his testimony of the previous day and the statements in his 1950 affidavit were untrue.[4] He testified that these statements were "cooked up" by Tony Romano and that he had told the story to an (unnamed) lawyer on an occasion when there were also present, at the lawyer's Brooklyn home, Tony Romano, George Miller, Frank Dale, and Margaret Dale.

Miller, also called by the state, testified that the written statement he signed had been brought to him by Tony Romano and that he, Miller, in fact never read it in its entirety.[5]

Two further witnesses were called by the state on May 26, 1953. Victor Bonaguro, who was the notary public whose certification and seal appeared on the 1950 affidavit of Miller, testified that he had in fact witnessed the execution of that affidavit. Miller testified that he, Miller, was not sworn by, and did not sign the statement in the presence of, Mr. Bonaguro. The Court thereupon remanded Bonaguro in lieu of $5,000 bail to await Grand Jury consideration of a charge of perjury.

The final witness, Edward Levy, had been Frank Dale's probation officer dur-

---

4. Upon assuming the stand again, Frinstein testified in substance that the previous evening, May 25, he had voluntarily gone to Assistant District Attorney Nussbaum and given a statement.

5. Miller also testified in substance that on the evening of May 25, 1953 he had voluntarily gone to the District Attorney's office to give a statement bearing on his testimony earlier that day.

ing the period following the shooting. Dale's affidavit stated that a month or so after the homicide of Davis, he, Dale, had told his probation officer that he was present in the tavern at the hold-up. Levy denied categorically that Dale had ever told him this.

On the beginning of the third day (May 27) of the hearing the state rested its case.

Mr. Sabbatino again moved to discontinue the proceedings because of unfairness. Mr. Sabbatino, however, went on to argue that the Court should consider the affidavit of Frank Dale. The Court refused to do so for the stated reason that Dale had not testified at the hearing. It was then disclosed, through the Court, that Dale, who had apparently been present in the witness room waiting to testify, on the first day of the hearing, was nowhere to be found and that, further, "I am informed the District Attorney would like to lay his hands on Mr. Dale."

In response to another invitation of the Court to do so, Mr. Sabbatino stated that he did not wish to re-open.

The Court thereupon denied the *coram nobis* application, with an accompanying statement in which, quoted in part, it said:

"* * * [T]his was a brazen and desperate attempt on the part of the underworld to free a murderer who * * * beyond a shadow of a doubt * * * took the life of Bummy Davis * * *.

"I want to also say that this was a desperate attempt to besmirch the reputation of a fine police officer. I refer to police officer Fritz. * * * It is a great credit to the fine police force that we have in the City of New York, and for these gangsters and criminals and perjurers to come into this Court and to attempt to besmirch the reputation of this fine heroic police officer merely adds insult to injury * * *."

On appeal from this denial, relator made, in substance, one legal argument: that the hearing before Judge Leibowitz had been essentially unfair. It was argued that the Court had been more interested in ferreting out perjury than in exploring the truth of relator's allegations and that, in consequence, witnesses were intimidated and discouraged from testifying. The decision of the *coram nobis* court was unanimously affirmed by the Appellate Division, Second Department, People v. Romano, 3 A.D.2d 855, 161 N.Y.S.2d 848 (2d Dept., 1957), and by the New York Court of Appeals, 4 N.Y.2d 757, 172 N.Y.S.2d 169, 149 N.E. 2d 94 (1958). Certiorari thereafter was denied by the United States Supreme Court, 357 U.S. 941, 78 S.Ct. 1391, 2 L.Ed.2d 1554 (1958).

■ The two basic allegations relator raises on this petition shall now be considered in turn. First, as to the assertion that the Assistant District Attorney at trial suppressed exonerating evidence, or otherwise knowingly sponsored perjured testimony, relator sought to prove this charge at the *coram nobis* hearing. The record of those proceedings contains sufficient evidence for the conclusion of the *coram nobis* court that this allegation was unfounded. I therefore accept that court's conclusion. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770; Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

■ Relator, however, maintains that the *coram nobis* proceedings were so essentially unfair as to be violative of his rights under the Fourteenth Amendment to the Constitution of the United States. If this be so, then this Court could not fairly base its present decision on those proceedings. This argument, to the extent that it raises a question of law, requires a new and independent determination by this Court. Brown v. Allen, 344 U.S. 443, 507, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

It is true that Judge Leibowitz took an active role in those proceedings, that his role was in large part a spirited "smoking-out" of perjurious testimony and that he may have been unusually

blunt and sharp with some of the witnesses. It is possible that his very zealousness in this endeavor, in some degree, could have "intimidated" witnesses. The record, however, and particularly the admissions of Frinstein and Miller on the second day of the proceedings, amply support the conclusion that perjury was in fact being committed.

■ Viewed in its entirety, the record does not disclose essential unfairness in the proceedings. Relator's counsel was given ample opportunity to prove his case; he was specifically invited to reopen at the close of the proceedings.[6]

Also, relator addressed this argument of unfairness to the appeal courts of New York, which rejected his contention. Their conclusion must have been based in significant part on a considered appraisal of the efficacy of the *coram nobis* proceedings as a search for truth. To that extent, this Court may, and indeed should, rest its conclusion here, that the state court proceedings were not "essentially unfair", on such prior determinations of fact.

Relator's second allegation is that Officer Fritz perjured himself at trial by giving an inaccurate version of the events leading up to Davis' death.

This allegation, and the rule of constitutional law on which its pertinence here rests, were not substantially argued as such at the *coram nobis* hearing. As already indicated, Frank Dale never testified at those proceedings, and because he absented himself without explanation after appearing on the first day, the Court refused to accept his affidavit.

It is true that counsel for relator did sketch out before Judge Leibowitz the claim that Officer Fritz perjured himself at the trial (see Tr. Coram Nobis, Folios 470–474). However, a reading of the record as a whole shows that the issue

on which the state, the relator, and Judge Leibowitz focused was that of the claimed suppression of evidence, or subornation of perjury, by the District Attorney's office.

■ Nonetheless, the issues raised and the testimony offered at the *coram nobis* proceedings, as well as the findings there reached, go as a practical matter to the heart of the allegation of Officer Fritz' perjury. It is determined, in short, that even if Judge Leibowitz did not formally make findings and conclusions on this issue, the evidence in the *coram nobis* record amply supports an independent finding here that there was no perjury as alleged on the part of Officer Fritz.

Relator's allegation concerning Fritz rests almost entirely on the story told by Frank Dale.[7] Dale is now deceased. His version of the shooting is presented in his 1950 affidavit and in a lengthy "Q and A" statement dated February 5, 1952.

Frinstein testified on the second day of the *coram nobis* hearing that his story, and, inferentially, those of Frank Dale and George Miller, were "cooked-up"; and that Frank Dale in fact was not in the tavern at the time of the robbery and shooting.

This testimony of Frinstein, as well as other testimony given by him and by Miller, led Judge Leibowitz to find that the entire presentation was a "brazen and desperate attempt" to free relator. This finding, together with the testimony of Frinstein that Frank Dale was not at the scene, amply supported as they are by the record presented on this application,[8] indicate that the allegation here sought to be raised is without persuasive factual foundation.

For the foregoing reasons, it is determined that a hearing here will be un-

---

6. See Tr. Coram Nobis, Folio 494, p. 165.

7. It is supported in important particulars by the testimony and written statements of his wife, Mrs. Dale.

8. For example, the various versions of the shooting recounted by the witnesses at the original trial are coherent, detailed, and uniform.

**166**

necessary and that the writ will be denied as lacking merit.[9]

This disposition of the matter, however, is made without prejudice to any application which the relator may care to make for a certificate of probable cause, pursuant to 28 U.S.C. § 2253, within the 30-day period provided.

So ordered.

---

9. It could be argued that since the relator did not squarely present the factual issue to the *coram nobis* court as to whether Officer Fritz gave perjured testimony at trial, such an allegation could be the basis for a renewed *coram nobis* petition in the courts of New York, and that, hence, relator has presently available to him a state remedy which should, under the principle of comity discussed in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, take precedence over the remedy of federal habeas corpus. Cf., People v. Sullivan, 4 N.Y.2d 472, 176 N.Y.S.2d 316, 151 N.E.2d 873 (1958). Recognizing this potential issue, I choose not to decide it.